Good morning. Good morning. I will reserve three minutes. All right. Good morning, Your Honors. My name is Ryan Saba of the law firm of Rose and Saba. I represent Dr. Luck, who is a professor at Columbia University and is watching us on live stream right now. My job today is to highlight for you the numerous triable issues of fact that exist in this case and why Judge Sammartino's decision granting summary judgment should be reversed. I'd like to start with the negligence cause of action. This seems to be a seminal issue in this case because no party was able to find any specific controlling law on this particular issue. And the issue is this. What duty does an employer have once an employer decides to conduct a workplace investigation? We believe that once that decision is made, an employer has a duty to, one, hire a qualified investigator that is not biased, and two, the investigator must conduct a thorough and complete investigation. Additionally, if a conclusion is reached and a report is prepared, the employer has the duty to keep the or protect the privacy rights of the target of the investigation. We believe those are basic duties that an employer... Are you suggesting that the report should not have been given to the complainant? Of the issue that the complainant makes. So if a complainant makes an issue of gender discrimination, the complainant is entitled to know the results of that particular investigation. And what we had here was a very unusual circumstance. We had a very large report prepared. It was 16 pages, but only six of those pages were dedicated toward gender discrimination. The remainder of the report, nine pages, were on a wholly separate topic, which was whether there was workplace dysfunction at the school. If the report had just concluded that there was workplace dysfunction, we all wouldn't be here today. The problem is, is that the report concluded it was caused by Dr. Luck. Pardon me, Mr. Salma. Yes. Maybe I'm... I may be dysfunctional here, but it seems to me that Dr. Luck resigned voluntarily so that whatever the result was of the investigation is not approximate cause of his damage. Actually, Your Honor, he resigned because of that specific clause in the report. It was crystal clear at the time of his resignation. The school ratified the report. Because of this report, you have to change your working style. Well, you can't be a dictator. That's really what it boils down to. And he didn't like that and quit. Well, I don't know if it's about being a dictator. Think of it this way. If you're a football coach and you're hired by the dean of the school and the football coach says, I want to run an offense that is based on running the ball all the time, but then you're later told, nope, you have to be a passing team. And the that's perfectly fair. And that's what happened here. Well, except for, I guess, you know, he claims that they promised him that he could exist independently. But he was... that it was misrepresented to him because it's actually a shared governance situation. It seems a bit... anyone that's been in academia and your client seems to be a personal style. I mean, he, you know, he's got another job and he seems that people recognize him for the things that he does. But it's... he's no neophyte to this. And shared governance is nothing new to academia. And someone that would say, well, yeah, we'll let you run it. Clearly, it would be hard for me to believe that someone with your client's experience would think that that means he can do whatever he wants and that he doesn't ever have to get any approval and that there isn't, you know. And he's been a faculty member and faculty members cherish the shared governance concept. A lot of presidents of universities would love to get rid of it, but it's just not the case. So, you know, it's... I'm not quite understanding how he can make that claim. Judge Callahan, that is a fantastic question. But what I think you're saying is that that's something a jury should be entitled to answer and we should be entitled to ask the jury to answer that question with the facts that we presented. University of San Diego, quite frankly, had a coup when they hired Dr. Luck. He was an exceptional candidate, well overqualified for this position. And one of the two attractive features for Dr. Luck to come to this school was the promise of a certain salary amount and a promise of independence governance style. That's what attracted him. What does he think that means? That he can do whatever he wants, whenever he wants, without any input from anybody on his staff? Well, that would be... That doesn't make any sense. Well, I understand that point. That would just be a poor leader and I understand that. Well, that's exactly what the situation developed, isn't it? Well, it turned out that way. But what he was promised was if he wanted to make decisions regarding budgets, about faculty, about classes, about what should be taught, syllabuses, et cetera, he would have that authority to make the decision. So suppose he decided that this particular professor, we're going to cut his salary by $25,000 just because he's not good enough. Nobody would have any say. Is that what his position is, really? No. His position... He always has to answer to his boss, which would be the provost and ultimately the president of the university. What he's trying to say is he doesn't have to answer to the people who are his subordinates, which would have been the faculty members. Does he have to listen to them? Well, I think a good manager always listens to them, but there's a difference between listening and having to do what they tell him to do. All right. The point is, is that when we get to this negligence cause of action, we presented this court and the underlying court very specific facts that this investigator breached her duty. She flat-out admitted it in deposition. I did not do a complete and thorough investigation. I did not ask Dr. Luck about these questions. I did not do a correct investigation on that issue, but I was told to put that in the report by the General Counsel of the University of San Diego. That caused damage. That affected Dr. Luck's ability to remain in control. Quite frankly, it undermined his authority to a point where he felt he had to quit his employment. His reputation preceded him when he took this job, and to have a report that was published to basically everybody in that school through Amy Carpenter saying that the dysfunction was caused by him caused him damage. And we should be entitled to present that factual story to a jury. We're not here to decide whether or not Dr. Luck's beliefs are correct or not correct. We are saying that all she should have said was, I found no gender discrimination and not address the underlying issue that was apparent to her investigation. After all, she talked to 20 people, including Dr. Luck, and essentially she came back and said, no gender discrimination, because nobody can get along with him now. Well, but she didn't. Had she said, there's dysfunction in the workplace, period, we, like I said, we wouldn't be here. But she drew the conclusion, and they told him he had to change his management style by saying it was caused by Dr. Luck. She never inquired of Dr. Luck of this issue. She didn't do an investigation on that issue. Where is the duty? Show me where the duty is and where the damages are, given the fact that he quit, he resigned. He quit because of that report. Well, you did not allege a constructive discharge. Well, no, that's part of our damage of the negligence cause of action, correct. We're saying that he quit his job because of that. Plus, he had reputational injury in addition to the monetary injury that he would suffer. But either way, the amount of damage would be a triable issue of fact anyway for a jury. We're here to only decide the legal issue, which is, what duty does any employer have when they conduct an investigation? And we think that that duty means you have to hire an unbiased investigator who does a complete and thorough investigation. And it's our allegation that the school didn't do that. We should be entitled to present that argument to a jury. And whatever the jury awards Dr. Luck or doesn't award him is the triable issue. Do you want to save the balance of your time? I do, unless there are specific questions you have at this time. I'll give you two minutes for rebuttal. Okay, thank you. Thank you. Good morning. Good morning. May it please the Court, Michael Sullivan on behalf of the University of San Diego and Dr. Amy Carpenter. Will you be using all the time? You have someone sitting there. They're not going to talk, right? Yeah, it's all me. Okay. He's just here to help. Well, why don't you go right to the point. Is it Amy? Is that a man or a woman? Woman. Amy Carpenter. Okay. It certainly is very unprofessional for Amy Carpenter to just put this report out to everyone, and isn't that what she just did? I mean, she shared it, so it, you know, the university shouldn't allow for that to happen, should they? Well, first of all, the university did caution her with regard to that. What's the evidence with regard to it? The evidence is clear that they asked her not to do that. But remember that the university is bound also by the National Labor Relations Act, which says, and the California Labor Code that says that you cannot constrain someone from talking about working conditions. This clearly is working conditions. What the supervisor is But talking about it and giving a report that someone does are two different things, aren't they? Well, I think it's just a method of communication. But it's someone else's communication. It's not hers. But this is the information that she has with regard to it. Had she characterized it, certainly she'd be sued for defamation on how she characterized that. I think the National Labor Relations Act, Section 7, protects the ability to do that. But in any event, she's not being sued for that. She's being sued for defamation because she made the complaint, and the university didn't sanction that. They advised her not to do that. So there certainly cannot be any responsibility on the part of the university for the fact that she engaged, whether professionally or not, her Section 7 rights to communicate about the work environment with her coworkers. So why did Branch give Dr. Luck no notice that dysfunctional working environment was being investigated? Dr. Luck says that Branch's internal investigation that Luck caused dysfunctional working environment, but not gender discrimination. And apparently, according to what the appellant is saying, the university found that to be true. And he didn't know that. He was told he was being investigated for gender discrimination, right? Well, but I think it's all part and parcel. You're trying to find out whether or not this person was subject to a dysfunctional environment because she was a woman. How had other people been treated? But it's sort of like I'm investigating you for pushing someone, but, okay, you didn't push them, but you spit on the sidewalk, and so we don't like that either. Are you littered? No, I would say that it's like investigating someone for bullying, and the question was, well, no, they were pushed first, and that's part of the relevant thing, and then the person pushed back. All that was communicated, and I want to be clear on correcting one fact that Mr. Saba said that is not supported by the record. She investigated what it was that was going on that would cause Amy Carpenter to believe she was being treated differently based on gender. In order to do that, she needed to find out how the men believed that they were being treated, how other women believed that they were treated. Well, I guess that wasn't my question. I agree. You would have to find that that would be part of it. But then what he's alleging is that out of it comes a finding that he's the cause of the dysfunctional workplace and has to change his management style. Is there a finding that it was a dysfunctional workplace? The investigator included a sentence in her report that said that. That was not the university that did that. The evidence, and it was not that the university asked for any such conclusion. There was no evidence in the report. The investigator said, would you like to hear the broader observations regarding the investigation? And, of course, what employer wouldn't, in fact, it would be negligent not to find out what those broader observations were. Those observations were included. And then, again, if you look at the undisputed facts, there was not then a ratification. There was not a conclusion. There was a toxic environment. Those are Dr. Luck's words. He admits there was a toxic environment. You need to address that. That's what the email from Provost Andy Allen said. Certainly, that is not a breach of any duty of ordinary care to say, I've learned, and remember, that Andy Allen had had his own conversations with the members of the faculty. They had come to him and spoken to him. So it wasn't just what he had heard from that. Again, this is all undisputed. And the fact is, he then says, you need to address these issues that are clearly prevalent, which Dr. Luck admits are prevalent, because he describes the environment, the work environment, as toxic. So what about his comments about what he was promised, and then it turned out that it was all this shared governance, and he really couldn't do anything that they said he could do? Well, again, I think we have to look at what the undisputed evidence was. The undisputed evidence is that he was told that he had to work collaboratively with faculty, that he had to get the input from all stakeholders, that he had to engage a range of constituencies. The concept of shared governance was certainly communicated, if not in using those words, that was directly communicated to him with regard to that. And then what was the breach of this? He says, oh, he would have to be allowed to do syllabuses. He doesn't say that anybody said you can't do a syllabus, that you can't do anything with regard to a course. The only evidence that he says is that the faculty reacted with backlash to that. The university didn't guarantee that the faculty was going to like his decisions, that they were going to like his management. They have to show that there was a statement that was false as to a past or existing fact, not predicting how the faculty was going to respond to his governance. They have not shown that to show any misrepresentation. So I think he would probably look, he would probably characterize this as essentially your university poached this celebrity academic and policy expert with UN credentials, and then you didn't protect him during the faculty politics battles. I don't think there's a legal cause of action for that. They certainly haven't identified anyone. There was no misrepresentation that was made. You can't bring a misrepresentation claim based on that. So if the answer is I don't think they adequately protected me from the political battles, there is no cause of action that's brought, and there is no legal claim for that. Well, and he necessarily, as is common I think in these, when you get a dean, they also, because they're already tenured, they negotiate that they would be tenured at the school because deans, if you research it, deans don't last forever, and there's an average shelf life on deans, and it's pretty short. So what about the next part of the process? How would you characterize that? Because he then said, okay, I'm going to be a tenured professor, and then there was a dispute over the salary. Well, yeah. And then you put him at some point on unpaid leave. The contract specifically provided that what his salary would be if he stayed there five years. It said if you stay until 2017 or beyond, this is what your salary was. The contract didn't contemplate the notion that he would step down earlier than that. Then there was discussion. He refused to work at that indicating unless you pay him $280,000 and later he reduced it to $210,000, which was more than double what anybody made in the school as a tenured faculty member, I won't work. So, no, again, there was no breach of any responsibility there, and his labor code section 201 claim certainly doesn't apply because there's no earned wages. He cites no authority where anyone is deemed to have had an earned wage where they didn't perform the work. Indeed, the case, the only case that he cites on that is the online power case, and in the online power case, the person disagreed with the amount that they were going to be paid. They thought they were going to be paid $185,000, and they were paid less than that, but they worked. They performed the work, and therefore, they had a claim then under the labor code. That does not exist here. Okay. It looks like I'm almost out of time, so I would just summarize to say that each of the arguments that Dr. Luck makes here would be a fundamental change with regard to California law. There is no authority that would support the fact that someone can take a representation like independent authority despite the record being replete with references to collaborative management and then bring a fraud claim. Thank you, Your Honor. Thank you. What I just heard sounds like a fantastic trial. It sounds like to me there are a plethora of facts. It sounds like to me each side will be able to present evidence of these issues to a jury so that a jury can make a decision as to whether or not Dr. Luck was falsely induced into accepting this job and whether or not the branch report caused him damage. There is a long history of facts that were presented to the underlying court here, and they're a part of this record as well. If you just go back, and I implore you to just read two documents, summarize everything very succinctly, and that is the declaration of Dr. Luck, which is on the record at 495. That declaration was presented obviously as part of the summary judgment motion. It is like 50 or 60 pages long, and it highlights in detail the representations that were made to him, how things were not true that were presented to him. Those are facts. Those are real And he should be entitled to present those facts to a jury. And the other document that is important to read, please, is part of the record is at 373, and that was that supplemental brief regarding deceit causes of action that Judge Sammartino asked the parties to brief at the time of the summary judgment. That brief lays out a chart of all the facts, all the disputed facts for each of the elements of deceit, and it lays it out specifically so that Judge Sammartino and this court can see that there are facts for each element of each cause of action that were presented to the court in the underlying case. And I understand this is on a de novo review, so I implore you to please review those two documents one last time. Thank you very much. All right. Thank you both for your argument in this matter. This case will stand submitted.
judges: Kelly, Callahan, Bea